***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The employee-employer relationship existed between the parties at all relevant times.
3. On September 1, 2000, plaintiff's annual salary was $29,444.00.
4. For the 52 weeks prior to September 1, 2000, plaintiff's average weekly wage was $528.21.
5. The issues for determination are:
a. Whether plaintiff's carpal tunnel syndrome is causally related to her employment with defendant?
b. Whether plaintiff's carpal tunnel syndrome is causally related to her compensable occupational disease of right epicondylitis?
c. To what benefits, if any, is plaintiff entitled under the Act?
7. The parties stipulated the following documentary evidence:
a. Stipulated Exhibit #1: Medical records
b. Stipulated Exhibit #2: Form 22 Wage Chart
8. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
a. Defendant's Exhibit #1: Job description from Division of Marine Fisheries
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 55 years old. Plaintiff began her employment with defendant in March 1998 as an administrative assistant in a grant funded position in the Education Department. Plaintiff's duties consisted of typing data entry and general administrative tasks.
2. In September 2000, plaintiff reported to her supervisor that she was experiencing problems with her right arm at the elbow. Defendant sent plaintiff to Dr. Marian Swinker for treatment.
3. Plaintiff presented to Dr. Swinker on September 21, 2000 with complaints of right arm pain that began with numbness, tingling and aching in the third and fourth fingers of the right hand. Plaintiff noted that she had spent the previous three and one half weeks writing a proposal and using a computer mouse, and that it hurt to move her arm off the desk. She further reported that her right elbow pain increased at night.
4. Dr. Swinker examined plaintiff and noted a positive Phalan test and a negative Tinel's test. She diagnosed plaintiff with mild carpal tunnel syndrome and right lateral epicondylitis, and suggested that plaintiff had poor ergonomics at her workstation. She prescribed wrist and elbow splints and recommended physical therapy.
5. An ergonomic study of plaintiff's workstation was performed and all recommendations were followed. Plaintiff received a new chair and other adjustments to her desk and equipment.
6. At the recommendation of Dr. Swinker, plaintiff attended physical therapy. Plaintiff returned to Dr. Swinker on October 17, 2000. At that time, plaintiff reported some improvement since the changes in her workstation and obtaining physical therapy; however, her right arm would lock up at night if she didn't move it during the night and it continued to ache until she moved around for a while. At this visit, plaintiff tested negative for both the Phalan test and the Tinel's test. Dr. Swinker opined that plaintiff's epicondylitis constituted a greater problem than the carpal tunnel syndrome and noted that the epicondylitis showed no signs of improvement.
7. Plaintiff presented to Dr. Swinker on November 14, 2000, noting that her elbow condition was improving but still present. Plaintiff further noted that her hand no longer bothered her.
8. At some time in December 2000, plaintiff was informed that the grant funding her position would run out on January 5, 2001 and would not be renewed. On December 19, 2000, plaintiff presented to Dr. Swinker and reported that since she received the news of the end of her grant, there was not much activity at work. Dr. Swinker noted that plaintiff's epicondylitis continued to be symptomatic but did not mention any hand pain in her notes.
10. On December 29, 2000, plaintiff presented to Dr. Lamont Wooten with a referral by Dr. Swinker. Following his examination of plaintiff, Dr. Wooten opined that plaintiff's primary problem was lateral epicondylitis and that she did not have significant carpal tunnel syndrome based on the negative results of Tinel's and Phalan tests and the absence of triggering or swelling on the flexor tendons.
11. On January 10, 2001, Dr. Swinker released plaintiff at maximum medical improvement with no rating. A report of plaintiff's medical evaluation signed by Dr. Swinker and dated January 16, 2001, indicates that plaintiff's right lateral epicondylitis and carpal tunnel syndrome had resolved.
12. Defendant accepted plaintiff's claim as compensable and paid for the treatment provided by Drs. Swinker and Wooten.
13. Plaintiff testified that following her release by Dr. Swinker, her hand still hurt and her elbow was better for six to eight months.
14. In May 2001, plaintiff obtained employment with the North Carolina Department of Marine Fisheries in Morehead City as a data entry supervisor. Plaintiff's duties did not include a great deal of data entry in the beginning, but a loss of staff increased her need to assist in that area. Plaintiff began to experience increasing pain and swelling in her right hand and elbow, with elbow pain at night and loss of sleep.
15. On August 10, 2001, plaintiff presented to East Carteret Family Practice with complaints of right elbow pain. She was diagnosed with chronic tendonitis and provided with medication and an injection. A follow-up exam conducted on August 28, 2001 noted that plaintiff still suffered from severe elbow pain.
16. Plaintiff was terminated from her employment with Marine Fisheries in December 2001. Plaintiff testified that her termination was the result of an inability to perform her job duties due to the right arm and hand pain she continued to suffer. Following her termination, she received unemployment benefits of approximately $283.00 for 44 weeks.
17. On May 24, 2002, plaintiff presented to orthopedic surgeon Dr. Robert Coles. Defendant transferred plaintiff's care from Dr. Wooten to Dr. Coles who was closer to plaintiff following her move to Morehead City. Plaintiff's main complaint was elbow pain, although she discussed occasional intermittent numbness in her fingers. Dr. Coles provided plaintiff with an injection for her elbow and recommended that she continue wearing the elbow strap and performing home physical therapy. Dr. Coles gave plaintiff a Tinel's test and Phalan test, both of which were negative for carpal tunnel syndrome. Dr. Coles diagnosed plaintiff with lateral epicondylitis in her right elbow.
18. Plaintiff returned to Dr. Coles on July 3, 2002 with minimal elbow pain. Plaintiff still reported intermittent numbness in the ulnar nerve distribution at the ring finger and to a lesser extent the middle finger of the right hand, especially while using her hands for overhead activities. Dr. Coles opined that plaintiff may be suffering from a neurologic condition and referred her to Dr. Kevin Good for nerve conduction tests. Dr. Coles noted that plaintiff's pain seemed to be coming from the median nerve and was not the result of carpal tunnel syndrome.
19. Plaintiff underwent nerve conduction studies with Dr. Good on July 15, 2002. Dr. Good concluded that plaintiff had median neuropathies at or distal to the carpal tunnels bilaterally which were moderate in degree. He specifically noted that "these findings support carpal tunnel syndrome."
20. In response to a request by plaintiff's counsel for an impairment rating dated July 2, 2002, Dr. Coles opined that plaintiff suffered solely from lateral epicondylitis, which does not generate an impairment rating.
21. Plaintiff returned to Dr. Coles on August 1, 2002 with the results of the nerve conduction studies. Dr. Coles noted that plaintiff's symptoms were gone, but plaintiff disputes this finding. Dr. Coles disagreed with the finding that plaintiff had carpal tunnel syndrome and opined that plaintiff's symptoms were the result of the lateral epicondylitis. He further opined that while the nerve conduction study results showed some slowing of nerve velocities, plaintiff did not have "the clinical picture of carpal tunnel syndrome" at this time or at any previous examination. Dr. Coles recommended that if plaintiff's elbow pain returned, plaintiff should not undergo further injection treatment but should have surgery on the elbow. He released plaintiff without restrictions to return on an "as needed" basis.
22. In a letter dated August 21, 2002, Dr. Coles stated that plaintiff does not have carpal tunnel syndrome. "She has electrodiagnostic evidence of carpal tunnel syndrome without the clinical picture of carpal tunnel syndrome." He further stated that plaintiff only developed the symptoms of carpal tunnel after learning that her EMG suggested the condition, evidenced by her lack of complaints consistent with carpal tunnel at any prior examinations. Because Dr. Coles believed that plaintiff "is in fact at this point becoming quite manipulative and in fact developing symptoms characteristic of diagnoses only after suggestion that certain diagnoses may be present," he suggested that plaintiff seek another opinion regarding her condition.
23. On December 5, 2002, plaintiff returned to Dr. Coles and requested surgery on her right elbow. Dr. Coles again examined plaintiff for signs of carpal tunnel syndrome. While he found a slightly positive result from the Phalan exam, plaintiff's relation of her symptoms was again not consistent with carpal tunnel syndrome. The surgery was scheduled, but plaintiff canceled the surgery due to an unrelated illness.
24. Dr. Coles opined that plaintiff suffered only from lateral epicondylitis and her hand and finger symptoms were secondary to that condition. He noted that she never had a positive Tinel's test, the positive results of Phalan and the mild electrodiagnostic evidence of carpal tunnel was not supported by the clinical picture, and plaintiff's descriptions of symptoms were never consistent with carpal tunnel syndrome.
25. Plaintiff obtained employment at a self-storage business in October and November 2003. Plaintiff's duties included reception and renting units; however, after the accountant left, plaintiff was asked to assume those duties. Plaintiff was terminated after two months, the cause of which is not in evidence. Thereafter, plaintiff obtained a job taking care of an elderly man, which she continued at the time of the hearing.
26. On January 22, 2004, plaintiff presented for a one-time second opinion examination by orthopedic surgeon Dr. Ray Armistead. Dr. Armistead performed an examination, which showed tenderness at the right elbow. He performed a Phalan's test, which caused increased numbness in both hands, greater on the right. In addition, Dr. Armistead reviewed the notes from Drs. Swinker, Coles and Good and took a history from plaintiff. Dr. Armistead diagnosed plaintiff with bilateral carpal tunnel syndrome, with the right somewhat worse, and right epicondylitis. He opined that the advanced state of the carpal tunnel syndrome dictated that it be treated first, and if any pain remained in the elbow following that treatment, it should be treated as a separate issue.
27. Dr. Armistead made a causal connection between plaintiff's carpal tunnel syndrome and her employment with defendant based upon the history provided by plaintiff, stating "She told me that she had not had any of these symptoms prior to her employment, so given that, and with the lack of any contrary evidence, I would say that her employment was the principal cause of the causation of problem." Dr. Armistead further opined that people who do excessive computer work such as data entry are more disposed to develop carpal tunnel syndrome than the general public. Dr. Armistead reached these conclusions without knowledge of plaintiff's data entry and accounting jobs after she left the employment of defendant.
28. Plaintiff treated with Dr. Swinker on approximately eight occasions. She was treated twice by Dr. Wooten and approximately ten times by Dr. Coles. Drs. Swinker, Wooten and Coles all have opined that plaintiff does not suffer from carpal tunnel syndrome, based upon repeated examinations and testing. Dr. Good noted that plaintiff's nerve conduction studies showed evidence of mild carpal tunnel, but did not make the diagnosis. Dr. Coles considered the findings of Dr. Good in reaching his diagnosis. The only physician who has diagnosed plaintiff with carpal tunnel syndrome is Dr. Armistead, who saw plaintiff once and based much of his diagnosis on plaintiff's own statements and incomplete history, disregarding the findings of the prior treating physicians.
29. The undersigned gives greater weight to the opinions of Drs. Swinker, Wooten and Coles than that of Dr. Armistead. Based upon the greater weight of the evidence, the undersigned finds as fact that plaintiff contracted lateral epicondylitis as a direct result of her employment with defendant. Plaintiff does not suffer from carpal tunnel syndrome, and the symptomology in her right hand is the result of her lateral epicondylitis.
30. No physician has given plaintiff any restrictions or written plaintiff out of work. Plaintiff's job with defendant ended as a result of the discontinuation of the funding grant. While plaintiff stated that she was unable to perform her job at Marine Fisheries, there is no evidence that this is the reason she was terminated from that employment. There is no evidence presented as to the reason for plaintiff's termination from the job with the storage facility.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted the occupational disease of lateral epicondylitis as a direct result of her employment with defendant. Defendant has accepted this condition as work-related. N.C. Gen. Stat. §97-2(6).
2. The greater weight of the expert medical evidence fails to show that plaintiff suffers from carpal tunnel syndrome or that if she does, that it is causally related to her employment with defendant. The sole testimony causally relating the condition to her employment comes from Dr. Armistead, who admittedly based his opinion upon the temporal aspect of plaintiff's history and without knowledge of her intervening employments. This is insufficient to support an expert medical opinion of causation.Young v. Hickory Business Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
3. Plaintiff has failed to present evidence sufficient to show that she has been disabled from employment as a result of her compensable occupational disease. Therefore, she is not entitled to indemnity compensation under the Act. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, including the epicondyl release surgery recommended by Dr. Coles. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits related to carpal tunnel syndrome is hereby DENIED.
2. Defendant shall pay medical expenses related to plaintiff's lateral epicondylitis incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
3. Plaintiff's claim for permanent partial disability, if any is RESERVED.
4. Each side shall bear its own costs. Defendant shall pay the expert witness fee of Dr. Armistead upon submission of a bill to the undersigned.
This the 13th day of October 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER